A TO Z MAINTENANCE CORP. and
Samuel Williams, Plaintiffs,

v.

Elizabeth DOLE, Secretary of the
United States Department of
Labor, Defendant.

Civ. No. 88–2875 (CRR).

United States District Court,
District of Columbia.

April 14, 1989.

Joel S. Rubinstein and Sheira Miller, Sadur and Pelland, Chartered, Washington, D.C., for plaintiffs.

Jay Stephens, U.S. Atty., John Bates and John C. Cleary, Asst. U.S. Attys., Washington, D.C., for defendant.

OPINION

CHARLES R. RICHEY, District Judge.

I. *Introduction*

This case arises under the McNamara–O'Hara Service Contract Act of 1965, as amended (the "SCA"). 41 U.S.C. § 351, *et seq.* The SCA regulates the contractual relationship between companies that provide services to the United States and their employees. To this end, the SCA sets forth certain provisions, intended to protect the contractor's employees, which must be included in virtually every contract for services executed by the United States.[1] These provisions obligate the contractor to satisfy certain standards relating to minimum wages, fringe benefits, working con-

---

1. By its terms, the SCA applies only to government service contracts which involve more than $2,500. 41 U.S.C. § 351(a).

ditions, and the like. 41 U.S.C. § 351(a)(1)–(5).

In addition, the SCA includes provisions which address contractors' violations of these mandatory contractual standards. One such SCA provision, at issue in this action, authorizes the Comptroller General to distribute to all agencies of the United States a list of contractors found to have violated their contracts, and thus to have violated the SCA. The contractors so named are barred from contracting with the United States for a period of three years. 41 U.S.C. § 354(a).[2] The only exemption from this sanction is where the Secretary of Labor finds, on the facts of a given case, that "unusual circumstances" justify excusing a particular contractor from debarment.[3]

The defendant in this action, A to Z Maintenance Corporation ("A to Z"), has provided services to the United States under contracts subject to the SCA since 1981.[4] On August 7, 1985, the Department of Labor's New York area Regional Solicitor filed an administrative complaint against A to Z. The complaint alleged that A to Z had violated various minimum wage and fringe benefit provisions of several of its contracts and of the SCA. The complaint further alleged that A to Z had failed to comply with several of the SCA's record keeping requirements. The Regional Solicitor's complaint recommended that A to Z suffer the sanction of debarment pursuant to § 354(a). A to Z answered the complaint, contending that no violations had occurred, and that even if they had, "un-

usual circumstances" existed such that debarment would be inappropriate.

On March 23, 1987, Administrative Law Judge G. Marvin Bober conducted a hearing on the complaint. His decision, issued on March 14, 1988, found that A to Z had repeatedly committed serious violations of the SCA under several of its contracts, and that "unusual circumstances" did not exist under § 354(a). The Deputy Secretary of Labor affirmed ALJ Bober's determination on August 23, 1988. The Deputy Secretary thus ordered that the names of both A to Z and its President, Samuel Williams, "be placed on the list of ineligible bidders in accordance with the provisions of the [SCA]".

A to Z promptly filed suit in this Court. A to Z's complaint primarily challenges ALJ Bober's finding, affirmed by the Deputy Secretary, that A to Z's case does not present "unusual circumstances" sufficient to avoid debarment under § 354(a). In support, A to Z contends that ALJ Bober applied an improper legal standard by giving weight to a 1980 administrative adjudication involving A to Z in which unusual circumstances *were* found to exist. A to Z also contends that ALJ Bober and the Deputy Secretary acted arbitrarily and capriciously by "ignoring" certain uncontroverted evidence in the record which, according to A to Z, establishes the inadvertence of the violations. Finally, A to Z contends that the Deputy Secretary applied an improper standard in affirming ALJ Bober's decision. Based upon the foregoing, A to Z asks this Court to reverse the administrative findings and to enjoin the inclusion of

2. Section 354(a) reads as follows:
   The Comptroller General is directed to distribute a list to all agencies of the Government giving the names of persons or firms that the Federal agencies or the Secretary have found to have violated this chapter. Unless the Secretary otherwise recommends because of unusual circumstances, no contract of the United States shall be awarded to the persons or firms appearing on this list or to any firm, corporation, partnership, or association in which such persons or firms have a substantial interest until three years have elapsed from the date of the publication of the list containing the name of such persons or firms. Where the Secretary does not otherwise recommend because of unusual circumstances,

he shall, not later than ninety days after a hearing examiner has made a finding of a violation of this chapter, forward to the Comptroller General the name of the individual or firm found to have violated the provisions of this chapter.

3. As described below, the "unusual circumstances" analysis is controlled and defined by regulation.

4. A to Z is a Pennsylvania corporation headquartered in Glassboro, New Jersey. It provides janitorial, custodial, food and maintenance services, primarily to military installations located in the mid-Atlantic region.

A to Z and Mr. Williams on the § 354(a) debarment list.

A to Z and the Department of Labor (the "DOL") have filed cross motions for summary judgment. Although the Court is uncomfortable with the severity of the sanction in this case,[5] it is compelled to conclude that, based upon the undisputed facts and the underlying law, the DOL is entitled to judgment. Should it decide to do so, the DOL may include A to Z and Mr. Williams on the list of debarred contractors pursuant to § 354(a).

## II. *Discussion*

### 1. Section 354(a) and "Unusual Circumstances"

Section 354(a) is a particularly unforgiving provision of a demanding statute. In concept, § 354(a) is simple: If a contractor violates *any* provision of an employment contract that the SCA requires to be included, the DOL *shall* forward the contractor's name to the Comptroller General for inclusion in the debarment list. The sole exception is for cases in which the Secretary of Labor concludes that "unusual circumstances" justify exclusion from the list. Section 354(a) does not require a series of violations as a prerequisite to debarment, nor does it require that the violations be substantial or the result of intentional or otherwise culpable behavior. Instead, § 354(a) provides without qualification that "a violation"—i.e., a single, perhaps wholly inadvertent violation—may provide grounds for debarment.

The Secretary's power to find "unusual circumstances" mitigates the facial harshness of § 354(a).[6] The Secretary's discretion in this regard, however, is not intended to permit the unbounded exercise of bureaucratic benevolence. Instead, over time, the DOL has developed a set of narrow, relatively demanding criteria which control the "unusual circumstances" determination. Originally set forth in an administrative adjudication, *Washington Moving & Storage Co.*, No. SCA–168 (August 16, 1973), the criteria are now contained in DOL regulations. *See* 29 C.F.R. § 4.188(b)(3).[7]

As structured in *Washington Moving* and § 4.188(b)(3), the "unusual circumstances" analysis contains two components. First, the decisionmaker determines the presence or absence of certain aggravating factors. These aggravating factors include a finding that the violation or violations were intentional or the product of culpable negligence. Additional aggravating factors are a history of similar violations, repeated violations of the Act, or violation or violations of a "serious nature." If any of these aggravating factors are found to be present, the Secretary cannot find "unusual circumstances"; the regulations state that if aggravating circumstances are found, "relief from debarment *cannot* be in order." 29 C.F.R. § 4.188(b)(3)(i) (emphasis added).

If no aggravating factors are found, however, the analysis proceeds to the second step. Under this second step, "prerequisites to relief" are a "good compliance history, cooperation in the investigation, repayment of moneys due, and sufficient assurances of future compliance." 29 C.F.R. § 4.188(b)(3)(ii). Nevertheless, even where these prerequisites—coupled with the absence of aggravating factors—are shown to exist, "a variety of other factors must still be considered" before "unusual circumstances" may be found. *Id.* These additional factors include such matters as whether the contractor has been the subject of previous investigations, whether the contractor has committed recordkeeping violations which impeded the investigation,

---

**5.** It is essentially undisputed that debarment would likely lead to A to Z's demise, and that it would cause Mr. Williams great personal financial hardship.

**6.** The understandable desire to ameliorate the harsh effects of debarment through the loophole of "unusual circumstances" has been the cause of most of the litigation in this area, both at the administrative and judicial levels.

**7.** The DOL's criteria for evaluating "unusual circumstances" have been found to provide a "rational and lawful approach" to the issue. *Federal Food Service, Inc. v. Donovan*, 658 F.2d 830, 833 (D.C.Cir.1981).

and whether liability turned upon the resolution of *bona fide* legal disputes. *Id.* It is significant that the Secretary enjoys at all times the discretion to deny an "unusual circumstances" exemption. A finding of "unusual circumstances" is never mandatory.[8]

The foregoing makes clear that a contractor seeking an "unusual circumstances" exemption from debarment must run a narrow gauntlet. Furthermore, the 1972 amendments to § 354(a), and their accompanying legislative history, make clear that this narrow gauntlet is consistent with legislative intent. A House Committee Report which preceded the 1972 amendments is suggestive of congressional sentiment toward the debarment process; the Committee recommended that

> the blacklisting provision of the McNamara–O'Hara Service Contract Act should be more expeditiously and rigorously applied, such application being clearly within the authority of the Secretary of Labor under the language of the statute. We trust that the foregoing considerations and the evidence developed during the hearings as to the intent of the Congress in putting section 5(a) [41 U.S.C. § 354(a)] into the act and the actual effect of its current application will encourage the Labor Department to strengthen its methods for applying the blacklist provisions to violators of the Act.

House Special Subcomm. on Labor, Comm. on Educ. & Labor, *The Plight of Service Workers Under Government Contracts* 12 (Comm. Print 1971). The regulatory criteria for evaluating "unusual circumstances," viewed against the backdrop of congressional intent, must control this Court's review of the DOL's determination.[9]

### 2. Unusual Circumstances In This Case

ALJ Bober found, in the first instance, and the Deputy Secretary agreed, that A to Z's compliance history presents "aggravating circumstances" under the first prong of the "unusual circumstances" analysis. Although hardly a model of clarity, ALJ Bober's opinion on this point appears to rely upon several of the criteria contained in 29 C.F.R. § 4.188(b)(3)(i).

### A. *History of Similar Violations*

First, ALJ Bober noted that A to Z (in predecessor form) and Mr. Williams had been the defendant in an administrative proceeding once before, in 1980. *Samuel H. Williams*, No. SCA–1180 (1980). In that prior proceeding, the ALJ found that violations had occurred, but that "unusual circumstances"—namely, the company's lack of familiarity with SCA requirements and its good faith efforts to remedy the problem—warranted exemption from debarment. The issue facing ALJ Bober was whether to take these previous violations—notwithstanding the fact that they were ultimately excused—into account in determining whether A to Z had a "history of similar violations" under 29 C.F.R.

---

**8.** A to Z cites administrative adjudications in which, it alleges, ALJs found "unusual circumstances" where "some" of the factors enumerated in *Washington Moving & Storage* and 29 C.F.R. § 4.188(b)(3) are present. For instance, A to Z cites the administrative decision in *John R. Mott, Inc. and John R. Mott, Individually*, SCA–1291 (1988). A to Z neglects to mention, however, that the ALJ in *Mott* did not find aggravating circumstances; thus, his finding in favor of the respondents as to "some" of the relevant factors—i.e., those set forth in the second step of the "unusual circumstances" test—was consistent with the structured analysis set forth in § 4.188(b)(3). Moreover, to the extent that *Mott* or any of the other administrative determinations cited by A to Z involve analyses that are inconsistent with the § 4.188(b)(3) analysis, the Court declines to give precedential effect to them, as they would appear to have been wrongly decided.

**9.** The normal standard of review applicable to agency factual determinations under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, is the substantial evidence standard. *Id.* at § 706(2)(A). Under the SCA, however, the Secretary's factual determinations must be supported by a preponderance of the evidence and are reviewable under that standard. 41 U.S.C. § 353(a) (incorporating 41 U.S.C. § 39). On the other hand, the Secretary's final decision, if based upon properly supported factual determinations, is reviewable under the arbitrary and capricious standard. 5 U.S.C. § 706. *See also, Federal Food Service, Inc. v. Donovan*, 658 F.2d 830, 833 (D.C.Cir.1981).

§ 4.188(b)(3)(i).[10]

ALJ Bober determined that it would be proper to consider the prior violations, and therefore found that A to Z and Mr. Williams had a history of previous violations. ALJ Bober reasoned that unfamiliarity with the requirements of the SCA may only constitute "unusual circumstances" once; from then on, a contractor is put on notice that strict compliance with the SCA is required. According to ALJ Bober, "a previous adjudication where unusual circumstances are found to exist should act as notice to the president and corporation giving a heightened sense of responsibility in the discharge of government contracts." *A to Z Maintenance Corp. and Samuel Williams*, No. SCA–98 at p. 8 (1988).

A to Z attacks ALJ Bober's holding on this point as erecting an impermissibly rigorous compliance standard for contractors who have been found once to have violated the SCA but who have escaped through the "unusual circumstances" loophole. The Court disagrees with A to Z.

In the Court's view, ALJ Bober's conclusion is eminently reasonable and reflects a common sense approach to the question. Further, even if ALJ Bober's holding does have the effect of limiting leniency toward second-time offenders, the standard it erects is no higher than the standard expressly articulated in the SCA and the regulations issued thereunder. Section 354(a) and 29 C.F.R. § 4.188(b)(3)(i) must be read to mean what they say: When a contractor who has been found to have violated the SCA in the past does so again, he or she must be debarred. Here, it appears that A to Z and Mr. Williams were found to have violated the SCA in 1980, although those violations were effectively excused. In 1988, ALJ Bober found that they subsequently violated the SCA in several different but related contexts. Applying the law as it now stands, these facts alone certainly permit—and may compel—ALJ Bober's conclusion. It thus appears that ALJ Bober's holding is utterly consonant with the letter of the applicable law; any discomfort that second-time violators may feel as a result is merely discomfort that both Congress, by statute, and the DOL, by regulation, intended to inflict.[11]

## B.  *Repeated Violations*

■ Setting aside the 1980 violations, both ALJ Bober and the Deputy Secretary found that the instant complaint resulted from investigations that had revealed "re-

---

**10.**  ALJ Bober put the question as follows:

The [prior] holding raises the question of whether the violations [found in the prior decision] may be considered as a "history of prior violations" relative to the issue of debarment in the instant case. I accept [the prior] findings in totality, but the fact remains that there are two ways to view the concept of "prior violations." On one hand, violations should not "count" as technically they are "excused;" or, previous violations are considered violations even where unusual circumstances are found to exist and therefore constitute notice the officers and corporation that future violations will not be tolerated. *A to Z Maintenance Corp. and Samuel Williams*, No. SCA–98 at p. 8 (1988).

**11.**  A to Z devotes much of its briefing to dicta in an administrative opinion in *Donovan v. Mottley*, SCA–101 at p. 8 (1984). In *Mottley*, the ALJ claimed that, under the SCA, government contractors operate under a "Catch–22." According to the ALJ, if a contractor disputes the DOL's position regarding a contract, yet determines to pay restitution in order to avoid a fight, the contractor's payments will later be used against him or her as evidence of prior violations. On the other hand, if the contractor refuses to pay, he or she will become the target of an administrative debarment action. A to Z contends that it chose the former route in several of the instances involved in this case, and that the DOL is now using its voluntary payments against the company as evidence of prior violations or repeated violations.

The Court disagrees that a "Catch–22" exists. In order for disputes with the DOL to be used against a contractor under the "unusual circumstances" analysis, a predicate finding must be made that an actual violation has been committed. Mere previous payments in response to DOL complaints, standing alone, are not (or at least should not be) sufficient bases for a finding of aggravated circumstances under 29 C.F.R. § 4.188(b)(3)(i). In this case, regarding prior violations, the ALJ in the 1980 proceeding found that A to Z and Mr. Williams had committed violations of the SCA, but that those violations were excused. Similarly, regarding repeated violations in this case, ALJ Bober found that A to Z had committed violations. These *violations*, and not the payments which followed, form the foundation of ALJ Bober's aggravated circumstances finding under § 4.188(b)(3)(i).

peated violations" of the SCA. As noted above, "repeated violations" is also one of the aggravating factors which preclude a finding of "unusual circumstances." The record before the Court amply supports ALJ Bober's finding of "repeated violations."

The record indicates that the DOL was forced to intercede on numerous occasions prior to filing the complaint in order to remedy A to Z's failure to honor its obligations. For instance, in regard to one of the contracts, A to Z agreed to provide employees with a uniform allowance.[12] This allowance, totalling $6,895, was to have been paid to employees by the end of May, 1985. A DOL investigation, however, revealed that the required payment had not been made as of July 3, 1985. A to Z explained the delinquent payment by claiming that an agreement which A to Z had reached with the employee's union permitted A to Z to (1) withhold individual payments until an exclusive source for the uniforms could be chosen, and (2) defer individual allowance payments until sometime in July of 1985. According to A to Z, this agreement with the employee's union excused its failure to comply with the terms of the contract. According to the DOL Compliance Officer who investigated the contract, however, the union informed him that no such agreement on a postponed payment had been reached. Ad.Rec. at 342. The union's position, as recounted through the Compliance Officer, was that the payments were due at the end of May, 1985. *Id.*

A to Z, in an effort to rebut the Compliance Officer's testimony, cites to the testimony of Malcolm Mitchell, an A to Z employee. According to A to Z, Mr. Mitchell's testimony clearly shows that the unions consented to the withholding of individual allowances. A close review of Mr. Mitchell's testimony, however, indicates precisely the opposite. Mr. Mitchell's testimony merely supports the proposition that the union acquiesced in A to Z's efforts to find an exclusive supplier of the uniforms. It does not support the contention that the union acquiesced in A to Z's plan to withhold individual payments, or that the union ever deferred A to Z's obligation to make those payments by the end of May, 1985. The fact that uniforms were to be purchased from a common source says nothing about the union's position on withholding, or about the union's willingness to defer individual payments.[13] There is no evidence to suggest that A to Z's failure to pay individual uniform allowances when due was anything other than violative of the terms of the contract in issue. ALJ Bober gave full credence to the Compliance Officer's testimony, as was entirely within his rights as a factfinder.

ALJ Bober also discussed another contract under which A to Z failed to pay health, welfare and pension benefits when due.[14] According to the Compliance Officer responsible for the contract, she met with A to Z approximately three months after the contract began to inform the company of its obligation to make such payments to the employees' union. A to Z conceded that it had not made the payments, but defended its failure on the grounds that it was negotiating with the union over coverage. When the Compliance Officer noted A to Z's obligation to pay the benefits directly to employees under such circumstances (or set up an escrow fund), A to Z chose to make direct retroactive payments to the employees for the three month delinquency period. Approximately three months later, however,

---

**12.** Contract No. DABT–3584–C–0177 (Walson Army Hospital).

**13.** Indeed, Mr. Mitchell's testimony expressly acknowledges a dispute with the employees' union over whether A to Z could withhold individual payments:

Well, what the unions objected to was our mass buying the uniforms with the appropriate allowances that had been allocated. They had no problem with us paying each individual his allowance and then having them go that particular location that we referred them to pick up the uniform and be sized for the uniform is which we eventually agreed upon, and then we paid the allowance. And that is the way that they purchased their uniforms. Ad.Rec. at 490.

**14.** Contract No. DABT–35–82–C–0061.

the Compliance Officer learned from the company's employees that A to Z had failed to make payments directly to employees for the succeeding three month period. When contacted, A to Z explained that it was on the verge of reaching agreement with the union, and that it had not made payments for that reason.

Upon hearing this, the Compliance Officer gave A to Z another month to reach agreement with the union, and then contacted the company to determine the matter's status. The Officer found that A to Z still had not agreed with the union, but had still not paid its employees. As before, *only* when the DOL contacted A to Z did the company pay its employees.[15] Finally, approximately two months later, the Compliance Officer again received calls from A to Z's employees, asking about the status of the benefit payments. During her third investigation of A to Z within nine months, the Officer learned that an agreement with the union had been signed approximately two months earlier (shortly after her previous contact with the company), but that still no payments had been made, either to the union or directly to the employees.[16] This despite the fact that the alleged obstacle to payment—difficulties with the employees' union—had been removed.[17] In the Court's view, A to Z's behavior during this period, as revealed in the record, indicates consistent and pervasive non-compliance with the company's contractual and statutory obligations. The Court concludes that ALJ Bober's finding that A to Z's actions during this period should be considered among the company's "repeated violations" of the SCA is supported by a preponderance of the evidence.

A to Z's violations of the two contracts just discussed undoubtedly suffice to support ALJ Bober's finding of "repeated violations" of the SCA. Even so, the record indicates, and ALJ Bober discussed, several other instances in which A to Z violated the terms of its contracts, and thereby deprived its employees over several years of the timely payment of as much as $287,000. A to Z may be correct that, in certain of these instances, the violations were the product of shabby recordkeeping or inadvertence. In others, the violations may (if one accepts A to Z's version of reality) have been the product of legitimate disputes or good faith misunderstandings. Nevertheless, as ALJ Bober found, substantial violations did occur, and, as in the cases described above, certain of the violations occurred with no discernible justification. Both individually and as a whole, these violations involved substantial amounts of money, and, therefore, significant interests. The "unusual circumstances" analysis, as expressed in 29 C.F.R. § 4.188(b)(3)(i), clearly contemplates the Secretary of Labor's authority to free the federal government (and the national labor pool) from chronic contract violators in circumstances such as these. The facts underlying the conclusions of ALJ Bober and the Deputy Secretary, in this Court's view, are supported by a preponderance of the evidence. Further, the facts found provide ample support for their conclusion that "unusual circumstances" do not exist in this case; their findings on this question are not arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

3. Improper Review by the Deputy Secretary

■ A to Z's final argument is that the Deputy Secretary failed to apply a proper standard in reviewing ALJ Bober's initial

---

**15.** A to Z contends that the DOL acquiesced in the company's failure to pay benefits directly to employees during the second three-month period. A to Z notes that the Compliance Officer testified at the administrative hearing that the DOL found "acceptable" a proposal by A to Z, pursuant to which A to Z would suggest an agreement to the union, and, if it were accepted, A to Z would make the back payments (for the second three-month period) directly to the union. A to Z cites Ad.Rec. 97 (Wuchinich testi-

mony). This argument, however, provides no explanation at all as to why payments were not made directly to employees in the first place during this second three-month period.

**16.** The final delinquency was approximately $33,000.

**17.** The discussion of Contract No. DABT–35–82–C–0061 is at Ad.Rec. 93–101.

determination. For the most part, A to Z's argument on this point simply rehashes the company's challenge to ALJ's Bober's decision. For instance, A to Z claims that the Deputy Secretary erred in failing to recognize that ALJ Bober had ignored evidence in the record which, according to A to Z, supported its position. Further, A to Z contends that the Deputy Secretary failed to correct ALJ Bober's statement that a contractor who escapes once through the "unusual circumstances" loophole is "put on notice" that strict contract compliance will be required. Essentially, A to Z seeks two bites at the apple: A to Z claims, first, that ALJ Bober erred in initially taking these positions, and, second, that the Deputy Secretary erred in failing to correct ALJ Bober's mistakes. As discussed above, however, ALJ Bober did not err in reaching his conclusions. The premise of A to Z's argument therefore fails. Further, as a simple analytical matter, the Court rejects A to Z's attempt to stretch its briefing by reiterating arguments previously made.

A to Z does offer, however, the "new" argument that the Deputy Secretary erred as a matter of law in not applying a "reasonable management" standard in accordance with *Federal Food Services, Inc. v. Donovan,* 658 F.2d 830 (D.C.Cir.1981). According to A to Z, *Federal Food Services* requires the Secretary of Labor to determine whether the violations which underlie the denial of an "unusual circumstances" exemption could have been prevented through "reasonable management." Because the Deputy Secretary failed to do so in this case, A to Z contends that the decision to affirm ALJ Bober's determination was improperly rendered.

A to Z misreads *Federal Food Services,* and the context in which the "reasonable management" issue arose. In that case, the DOL and the district court had relied upon their belief that "reasonable management" could have prevented the contractor's nearly *de minimis* violations of the SCA. For that reason, Secretary denied an "unusual circumstances" exemption, and the district court affirmed. The Court of Appeals reversed, finding an absence of evidence in the record from which a reason-

able factfinder could have concluded that "reasonable management" would have avoided the minor violations in that case. The Court reasoned that, insofar as the record indicated, the violations might well have occurred even with reasonable management. According to the Court of Appeals:

> We hold that where, as here, the ALJ has made an inference of improper management solely on the basis of virtually *de minimis* underpayments, the Secretary must consider the particular circumstances of the business under review—for example, the actual problems it has faced, the precautions normally taken by well-managed companies in the field, the likelihood that it could have avoided its violations with proper management—before implementing the severe debarment provision. If as here he relies on a history of previous violations to support debarment, he must apply the standards of reasonable management to them as well.

*Id.* at 834.

The instant case is clearly distinguishable from *Federal Food Services,* in that the violations at issue here are substantially greater than *de minimis.* The violations, and the amounts involved, are simply not of a type that might arise inadvertently in the operations of a well managed company. Instead, as ALJ Bober found, the violations in this case reflect, if not willfulness, at the very least culpable negligence. The record supports this conclusion. Accordingly, the circumstances which moved the Court of Appeals to order application of a "reasonable management" standard in *Federal Food Services* do not apply here; A to Z's effort to extend that test to all "unusual circumstances" cases involving prior violations must fail.

### III. *Conclusion*

The Court finds that ALJ Bober's conclusion (as affirmed by the Deputy Secretary of Labor) that A to Z violated the SCA in several respects, and that those violations do not present "unusual circumstances" within the meaning of § 354(a) is, as to facts, supported by a preponderance of the evidence, and, as to law, not arbitrary and

capricious. Because this finding is derived from facts not in genuine dispute, summary judgment under Fed.R.Civ.P. 56(c) shall be granted in favor of the DOL.

In closing, the Court wishes to note that it recognizes the severity of the debarment sanction involved in this case. Frankly, the Court is uncomfortable with the unforgiving impact that its decision will have on A to Z, Mr. Williams and A to Z's employees. Nevertheless, the Court is constrained to apply the law as written. The severity of the sanction under § 354(a) must be the concern of Congress, not of the courts; appeals for leniency should be directed to those who draft statutes, not to those who apply them.

An Order shall issue.

## ORDER

For the reasons expressed in the Opinion issued of even date herewith, it is, by the Court, this 14 day of April, 1989,

ORDERED, that the motion for summary judgment filed by the defendant shall be, and hereby is, GRANTED, and the motion for summary judgment filed by the plaintiff shall be, and hereby is, DENIED; and it is further

ORDERED, that judgment shall be, and hereby is, entered in favor of the defendant, and the above-captioned matter shall be removed from the dockets of this Court.